DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant, Patrick M. Knoble, appeals from his conviction in the Oberlin Municipal Court. This Court affirms.
 I {¶ 2} Knoble was the agricultural teacher at the high school in the Wellington City School District since 1999. He also served as the president of the teacher's union, a capacity that required him to work closely with Dr. Victor Cardenzana, the complainant in this case. In the fall of 2005, the two were engaged in teacher contract negotiations, which led to a decline in the professional relationship between them. In August 2006, Knoble was demoted from his teaching position and assigned to be a study hall and playground monitor at the middle school, where Cardenzana's office was located. Shortly after returning from holiday break in January 2007, Knoble made statements to three different school employees on three different occasions where he discussed harming Cardenzana. Within a week of Knoble's statements, both cafeteria *Page 2 
workers and the fellow teacher who had heard the statements reported the content of their exchanges to Cardenzana.
 {¶ 3} Cardenzana subsequently contacted police on January 11, 2007 and later filed a complaint against Knoble. On February 7, 2007, after further investigation of Cardenzana's complaint, Knoble was charged with aggravated menacing, pursuant to R.C. 2903.21.
 {¶ 4} On October 26, 2007, the matter proceeded to a bench trial. The trial court found Knoble guilty of aggravated menacing and sentenced him to 120 days in jail and a $500 fine. The trial court stayed execution of the sentence pending Knoble's appeal before this Court.
 {¶ 5} Knoble's appeal is now before this Court and presents three assignments of error for our review. For ease of analysis, we combine Knoble's first two assignments of error.
 II Assignment of Error Number One "THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO."
 Assignment of Error Number Two "THE VERDICT IN THIS CASE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ANS SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO."
 {¶ 6} In his first and second assignments of error, Knoble asserts that his aggravated menacing conviction is based on insufficient evidence and is against the weight of the evidence. Specifically, he avers that the threats were not made directly to Cardenzana, nor to a member of Cardenzana's family, and that they were not made to people he knew or should have known *Page 3 
would convey his threats to Cardenzana, therefore, his statements do not constitute aggravated menacing under the statute. He further contends that the State failed to present sufficient evidence to prove Cardenzana believed he was in danger of serious physical harm as a result of Knoble's alleged threats.
 {¶ 7} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, 279. Furthermore:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus; see, also, Thompkins, 78 Ohio St.3d at 386.
In State v. Roberts, this Court explained that "[s]ufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. Accordingly, we address Knoble's challenge to the weight of the evidence first, as it is dispositive of his claim of sufficiency.
 {¶ 8} In determining whether a conviction is against the manifest weight of the evidence an appellate court: *Page 4 
 "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten, 33 Ohio App.3d at 340.
 {¶ 9} Knoble contends that, because the threats were not made directly to Cardenzana, but were relayed to him by others, his conduct fails to satisfy the requisite elements to support an aggravated menacing conviction. In response, the State argues that the threats need not be made directly to Cardenzana, but rather, it is sufficient if they were made to a third party who Knoble knew or should have known would report the threats to Cardenzana.
 {¶ 10} We note that there is a split in the appellate courts on the issue of whether or not the menacing threat needs to be made directly to the intended victim or to the intended victim's family. The Fifth, Seventh, and Eleventh Districts require that, for an aggravated menacing conviction under R.C. 2903.21, the defendant must directly address his statements to the intended victim or a close relative of the victim.State v. Hileman, 5th Dist. No. 04 COA 048, 2005-Ohio-1698, at ¶ 27-28;State v. Richard (1998), 129 Ohio App.3d 556, 560; and State v.Chmiel, (Sept. 26, 1997), 11th Dist. No. 96-L-173, at *2. The First, Second, Tenth and Twelfth *Page 5 
Districts, however, have held that the menacing threat need not be made in the presence of the intended victim. In re Fugate, 10th Dist. No. 01AP-1195, 2002-Ohio-2771, at ¶ 12; State v. Lambert (June 5, 1998), 2d Dist. No. 16667, at *4; State v. Manny (May 26, 1992), 12th Dist. No. CA91-06-054, at *3; State v. Roberts (Sept. 26, 1990), 1st Dist. No. C-890639, at *1; and State v. Kuhn (Mar. 28, 1984), 1st Dist. Nos. C-830489 C-830490, at *1.
 {¶ 11} We begin our analysis with the statute at issue. The language of R.C. 2903.21 requires that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." Furthermore, R.C. 2901.22(B) informs us that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 12} "[W]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom."Hubbard v. Canton City School Bd. of Edn., 97 Ohio St.3d 451,2002-Ohio-6718, at ¶ 14. "If it is ambiguous, we must then interpret the statute to determine the General Assembly's intent. If it is not ambiguous, then we need not interpret it; we must simply apply it."State v. Hairston, 101 Ohio St.3d 308, 2004-Ohio-969, at ¶ 13.
 {¶ 13} We conclude that R.C. 2903.21 is clear and unambiguous on its face and does not impose a requirement that the threat of harm must be uttered directly to the intended victim. Those districts that require the threat be made directly to the victim proceed to delve into the legislative history of the statute without first making an express finding that it is, in fact, *Page 6 
ambiguous. They ultimately hold that the legislature intended that the threat be uttered directly to the intended victim:
 "[B]ecause prior to 1974, the alleged perpetrator had to threaten to injure the person to whom he or she was speaking. However, after 1974, the General Assembly broadened the class of potential victims to include immediate family members of the person to whom the alleged perpetrator made the threat of serious physical harm. In expanding the class of potential victims, the General Assembly did not go so far as to include persons who were not directly spoken to by the alleged perpetrator or persons who were not immediate family members of the person spoken to by the alleged perpetrator." Hileman at ¶ 27.
We, however, are not willing to make that "addition to the statute" as other districts have done because we find the statute is unambiguous on its face.[1] See Hubbard at ¶ 14. Instead, we look to the plain meaning of the statute and consider that "[t]he question [here] is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." Hairston at ¶ 12, quoting Slingluff v.Weaver (1902), 66 Ohio St. 621.
 {¶ 14} Accordingly, we must now determine if the evidence supports a finding that Knoble knowingly threatened serious physical harm to Cardenzana. The State presented three witnesses at trial in support of their case: Kathy Bockmore, a fourth grade teacher who worked *Page 7 
on staff with Knoble; Barbara Ziegler, the head cook in the middle school cafeteria; and Regina Seabold, who was the cafeteria cashier.
 {¶ 15} Bockmore was familiar with Knoble not only as a former student and fellow faculty member, but also as the teacher of her two children. Bockmore testified that in early January 2007 she saw Knoble and inquired as to how he was doing. He responded that he was "not very good, [and that he would] like to see this school building burn down with Brian Phelan [the school board president] and Vic Cardenzana in it and [that he would] light the match." Bockmore stated she was "upset" about the comment and was "concerned about the safety of the superintendent and the president of the school board as well as (unintelligible) school." Bockmore waited approximately a week before notifying Cardenzana of the threats she heard from Knoble, stating that "[i]t was a very difficult thing for me to do, having known him * * * [and because] he's been to our home before." She felt that "it was a part of [her] job to ensure [the students'] safety" and "realize[d] that [her] responsibility in all of this was heavier than [her] relationship" with Knoble.
 {¶ 16} Next, Ziegler testified that she would talk to Knoble when he was working in the cafeteria and that on January 8, 2007, he made statements about Cardenzana that concerned her. Specifically, Knoble relayed to her a dream that he had had the night before, where he "had shot Dr. Cardenzana * * * and wished that he could see him dead." Knoble went on to tell her "he wanted his life back." Ziegler told Knoble he would likely go to prison if he really did shoot Cardenzana; Knoble responded that he would "just plead innocent by reason of insanity." Ziegler described Knoble as "upset" with "tears in his eyes" when he made the aforementioned statements to her. *Page 8 
 {¶ 17} Later that same week, Ziegler was placing turkey in the cafeteria freezer when Knoble stated that he "should take some of that turkey home * * * [so] he could put arsenic in it and take care of Dr. Cardenzana." Zeigler waited a few days before notifying Cardenzana of the threats. She testified that she told Cardenzana because she "had a fear for his safety and for [the] safety of the students and for the safety of Mr. Knoble himself."
 {¶ 18} Seabold stated that she saw Knoble regularly in the cafeteria and testified that once school resumed after the holiday break, Knoble was "very upset that Dr. C had told him he could no longer have students (unintelligible) [at the] table to talk to him during study hall." She further stated that he was "very angry and said that he was going to get him and that (unintelligible) burn to the ground." She recalled that during the conversation "[h]e was very red in the face and his eyes were very dark" and that he "held his * * * head in his hands and just said he couldn't stand it here, just hated this place." Seabold stated Knoble went on to state that "he was going to get him." Additionally, Seabold testified that at one point, Knoble showed him a knife he had with him at school, telling her it "was the best knife he ever owned." Seabold was concerned because Knoble was "extremely, extremely agitated" and she knew that weapons were not permitted in the school. In light of Knoble's recent statements that "he hated this place and that he was going to get him," she said she felt scared and subsequently reported her interactions with Knoble to Cardenzana.
 {¶ 19} Cardenzana testified that upon hearing the statements of Seabold, Ziegler, and Bockmore, he became "very concerned about [his] safety, [his] family's safety and also the safety of the students in the building and the staff." Cardenzana stated that he had received and investigated a parent's complaint regarding Knoble just two days before learning of the aforementioned threats, which led him to have even greater concern about his safety. The timing *Page 9 
of the two incidents made Cardenzana feel that he should "do something very quickly [because he had] a serious concern about [his] safety and the safety of the students and staff in the building." Furthermore, he was "very concerned" and "uneasy" once hearing of Knoble's threats. Specifically, because Cardenzana arrived at the building very early everyday, he feared "what's around the corner because it's * * * dark" and because he knew "that [Knoble] could have access to the building" before any others had arrived for the day.
 {¶ 20} Knoble does not dispute making any of the aforementioned statements to any of the witnesses. He admitted that being relieved from his teaching duties "was torture" and that he was "angry" at Cardenzana for his job restrictions and his demotion. Knoble considered Cardenzana responsible for "spearhead[ing] the investigation about different things" and having his teaching certificate revoked. He also concedes that he wished to harm Cardenzana "financially" and that some day he "would probably sue him." At trial, Knoble maintained that he was just "venting" and "joking" when he made the comments about "light[ing] the match" and poisoning Cardenzana's food.
 {¶ 21} Knoble argues that Cardenzana never testified that he feared "serious physical harm" from Knoble's threats, as required by statute. While "evidence of one's belief of serious physical harm may be established by circumstantial evidence * * * [the] subjective belief of the victim is necessary to establish the crime of aggravated menacing." (Internal quotations omitted and citations omitted.) Fugate at ¶ 10.
 {¶ 22} Cardenzana testified to a tumultuous past between he and Knoble and that he had "serious concerns about [his] safety" when the employees informed him of content and nature of the threats Knoble directed toward him. Though one of the professional restrictions placed on Knoble was that he was unable to have keys to the building in which he and Cardenzana worked, *Page 10 
Cardenzana testified that he was afraid others might allow Knoble into the school before hours, which made Cardenzana "uneasy, because * * * because [the school is] all dark." Additionally, Cardenzana had just investigated a parent's complaint involving Knoble when he learned of Knoble's threats, and that combination of events led Cardenzana to have even greater concern for his safety, as well as the safety of the students and school staff. Thus, Cardenzana promptly contacted police and filed his complaint. While we agree that Cardenzana may have never uttered the words "serious physical harm" during his testimony, we believe that such harm can be construed from the context and the nature of the statement made and that there is sufficient evidence to support Cardenzana having a genuine fear that Knoble would direct harmful actions toward him.
 {¶ 23} Knoble also argues he did not think his statements would be communicated to Cardenzana and that he would not have made them if he thought they would, thus his conviction under R.C. 2903.21 is against the weight of the evidence. In light of the foregoing, we do not agree. We believe that "the trial court judge, did not lose his way in considering the evidence * * * [and] was in the best position to weigh the credibility of the witnesses before him." (Citations omitted.) State v.Peterson, 9th Dist. No. 23434, 2007-Ohio-2091, at ¶ 19. Furthermore, "for [Knoble] to have spoken knowingly, it must have been `more likely than not'" that the school employees would relate his statements to Cardenzana. Richard, 129 Ohio App.3d at 562.
 {¶ 24} Here, Knoble admitted that he was angry and frustrated by his professional decline and that he blamed Cardenzana for it occurring. Knoble then approached three different people (two of whom, he admits, were no more than acquaintances) on three different occasions to inform them of his intent to harm Cardenzana. These witnesses uniformly testified that *Page 11 
Knoble was "upset" and "extremely agitated," and from all appearances, emotionally unstable at the time the threats were made. His colleague and former teacher weighed his comments for days, but ultimately determined that his threats were so serious to the safety of the school, its students, and its superintendent, that she had to inform Cardenzana of them.
 {¶ 25} Given the gravity of the threats, Knoble's delicate emotional state and the contemporaneous nature of his comments to multiple people, we concur with the trial court's determination that Knoble's threats were made knowingly. We conclude that Knoble was "aware that his conduct [would] probably cause a certain result or [would] probably be of a certain nature." That is, it was "more likely than not" that one, and in this case all, of the witnesses would probably inform Cardenzana of his threats.
 {¶ 26} After reviewing the record in its entirety, this Court is not convinced that Knoble's aggravated menacing conviction is against the weight of the evidence.Having disposed of Knoble's challenge to the weight of the evidence, we similarly dispose of his sufficiency challenge. See Roberts, supra, at *2. Consequently, Knoble's first and second assignments of error are without merit.
 Assignment of Error Number Three "THE TRIAL COURT ERRED IN BASING IT'S (sic) GUILTY VERDICT ON IRRELEVANT EVIDENCE, THEREBY DEPRIVING APPELLANT OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION."
 {¶ 27} In his third assignment of error, Knoble argues that the trial court erred by basing its verdict on irrelevant evidence. Specifically, he argues that trial court should not have considered any of Bockmore's testimony because she did not inform Cardenzana of Knoble's statements until the date after he spoke with police and filed his complaint. However, Knoble *Page 12 
failed to object to the introduction of any testimony from Bockmore. Because this issue was not preserved at trial, Knoble has forfeited any objection to Bockmore's testimony on appeal. See State v. Payne,114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 23. Knoble's forfeiture permits this Court to review his claim for plain error, however, he has not argued that on appeal. See State v. Hairston, 9th Dist. No. 05CA008768,2006-Ohio-4925, at ¶ 11 (determining that the appellate court will not conduct plain error analysis sua sponte). Thus, we find his third assignment of error without merit.
 III {¶ 28} Knoble's assignments of error are overruled. The judgment of the Oberlin Municipal Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Oberlin Municipal Court, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. *Page 13 
Costs taxed to Appellant.
CARR, P. J., MOORE, J. CONCUR
[1] We note that even if we were to look to the legislative intent behind the enactment of this statute, we would reach the same conclusion that the threat need not be uttered directly to its intended victim. We point to R.C. 2903.21's use of the term "knowingly" as support for our contention that, as long as the defendant knew or thought it probable that the threats would be conveyed to the intended victim, irrespective of whom the threats were spoken to, the defendant is in violation of R.C. 2903.21. Furthermore, the idea that threats do not constitute aggravated menacing unless they are spoken directly to the intended victim, when taken to its logical extreme in this case, would mean that Knoble could inform every member of the middle school faculty and staff about his desire to "see this school building burn down with * * * Vic Cardenzana in it and [that he would] light the match," (see discussion, infra) yet face no criminal charges as a consequence. We do not believe that this is what the legislature intended when it amended the statute in 1974 to "broaden" the class of people affected by a threat of harm. Therefore, we reject the conclusion that the legislative history of R.C. 2903.21 requires that the intended victim be present when a threat of harm is made. *Page 1