[Cite as *State v. McNair*, 2015-Ohio-2980.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

| STATE OF OHIO | | C.A. No. 13CA010485 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| TRAVIS M. MCNAIR | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 13CR087466 |

DECISION AND JOURNAL ENTRY

Dated: July 27, 2015

MOORE, Judge.

{¶1} Defendant, Travis McNair, appeals from the judgment of the Lorain County Court of Common Pleas. We affirm.

I.

{¶2} In 2013, the Lorain County Grand Jury indicted Mr. McNair on one count of aggravated robbery in violation of R.C. 2911.01(A)(1), one count of aggravated robbery in violation of R.C. 2911.01(A)(3), one count of felonious assault in violation of R.C. 2903.11(A)(1), and one count of felonious assault in violation of R.C. 2903.11(A)(2), together with firearm specifications attendant to all counts. These charges stemmed from the shooting of Jarell Carroll after an outdoor dice game attended by several individuals, including Mr. Carroll, his girlfriend, and Mr. McNair. Mr. McNair pleaded not guilty to the charges, and he thereafter waived his right to a jury trial. Following a bench trial, the court found Mr. McNair guilty on all charges.

{¶3} For purposes of sentencing, the trial court merged the two aggravated robbery counts with each other, and it merged the two felonious assault counts with each other. The court sentenced Mr. McNair to an aggregate term of seven years of incarceration. Mr. McNair timely appealed from the sentencing entry, and he now raises three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED TO THE DETRIMENT OF [MR. MCNAIR] WHEN THE COURT FOUND [HIM] GUILTY BASED UPON EVIDENCE THAT WAS NOT OF THE QUALITY TO ESTABLISH PROOF BEYOND A REASONABLE DOUBT.

{¶4} In his first assignment of error, Mr. McNair argues that his convictions were against the manifest weight of the evidence. We disagree.

{¶5} When a defendant asserts that his conviction is against the manifest weight of the evidence:

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

State v. Otten, 33 Ohio App.3d 339, 340 (9th Dist.1986). "In making this determination, this Court is mindful that evaluating the evidence and assessing credibility are primarily for the trier of fact." (Quotation and citations omitted.) State v. Persinger, 9th Dist. Lorain No. 13CA010397, 2014-Ohio-4125, ¶ 13.

{¶6} Here, Mr. McNair was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) and (A)(3), and felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), together with firearm specifications pursuant to R.C. 2941.145.

**{¶7}** R.C. 2911.01(A)(1) and (A)(3) provide:

No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

**{¶8}** R.C. 2903.11(A)(1) and (A)(2) provide:

No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

**{¶9}** Mr. McNair does not challenge the weight of the evidence as to any specific element of the offenses. Instead, he challenges the weight of the evidence identifying him as possessing the gun and shooting Mr. Carroll. We will confine our review accordingly.

**{¶10}** At trial, the State's witnesses included Samantha Adams, officers from the Elyria Police Department, a security guard, and a forensic scientist. Ms. Adams testified that on the date of the incident she was dating Mr. Carroll, who was also known as "Rell[.]" On that evening, she and Mr. Carroll went to South Park Apartments in Elyria, where Mr. Carroll began shooting dice for money with another man, who was unknown to Ms. Adams. At that time, Mr. McNair, who was also known as "Balla" was present, making side bets on the dice game. The unknown man won $100 and then decided to quit the game. Mr. McNair then offered to shoot dice with Mr. Carroll. When Mr. McNair began losing, the men began arguing. Ms. Adams then saw Mr. McNair "walk over to some heavyset dude that was sitting on the car right next to

[her] and ask him for the gun." Mr. McNair obtained the gun, which he put in his pocket, and he continued to shoot dice with Mr. Carroll, who Ms. Adams testified never carried a gun while he and Ms. Adams were dating.

{¶11} Ms. Adams further testified that Mr. Carroll decided to leave the game when Mr. McNair was down $40. Mr. McNair followed him, arguing with him. She saw the men start to "tussl[e.]" Ms. Adams saw Mr. McNair with the gun in the air toward Mr. Carroll, and he was telling him to empty his pockets. Mr. Carroll was holding Mr. McNair's hands in the air to keep the gun away from him. Mr. Carroll then pushed Mr. McNair, and Mr. Carroll and Ms. Adams started to run. While Ms. Adams was running toward a building to hide, she heard two gunshots. Once inside the building, Ms. Adams looked back through a diamond-shaped "peephole" in the door, and she saw Mr. Carroll running away in a different direction. She then heard another two gunshots. After the second gunshot, Mr. Carroll was limping. She ran out of the building, and heard Mr. McNair say that he "better run, I'm going to kill him." Other individuals assisted Mr. Carroll into a building, as Mr. McNair drove away on a yellow motorcycle.

{¶12} On cross-examination, Ms. Adams confirmed that she and Mr. Carroll had been involved in a romantic relationship for a year, and they had since broken up. She acknowledged that she had spoken with Mr. Carroll prior to her testimony, on the same day that she testified, but they were not really friends. She maintained that she knew Mr. McNair pretty well, but did not previously know his real name. Instead, she knew him only as "Balla[.]" She maintained that she saw Mr. McNair shoot Mr. Carroll out of the window/peephole of the building door. Ms. Adams stated that she did not see the first two shots being fired, but after she reached the building and looked out the window, she saw "Balla like this with a gun in his hand shooting at Rell." She remembered giving a statement to the police after the incident, and she acknowledged

that, when she first talked to one of the detectives investigating the case, she told him she did not know who the shooter was because she was terrified.

{¶13} On redirect, the State asked Ms. Adams if there was "any doubt [she] saw Balla firing that gun[,]" to which she responded "I seen the gun go off. I seen the little fire come out that gun."

{¶14} A security officer for the apartment complex testified that he did not witness the shooting, but he was working on the night of the incident, and he heard several shots coming from inside the complex. He authenticated surveillance video taken on the night of the incident. He explained that the recording was dark due to the outage of an overhead light in the area. In the recording, at approximately 9:40 p.m., individuals in the outside areas of the complex can be seen running toward the buildings. In one camera view, individuals are assisting a man into one of the buildings.

{¶15} A responding police officer, Officer Fred Merrill, testified that Mr. Carroll appeared to have been shot through the back of his left leg.[1] Detective Michael Groomes testified that he was a short distance from the scene, working a side job, on the night at issue when he heard a call over dispatch concerning a man on a yellow motorcycle. Detective Groomes saw a motorcycle matching that description coming in his direction, and radioed all units as to the location, and he followed it in an unmarked vehicle. Marked cruisers attempted to stop the motorcycle, but the driver accelerated at a high rate of speed, and ran two stop lights.

---

[1] Officer Merrill further testified concerning statements that Mr. Carroll made at the scene, and the admission of this testimony is challenged in Mr. McNair's second assignment of error. As this testimony is unnecessary to our resolution of the first assignment of error, we defer our discussion of Mr. Carroll's on-scene statements until our discussion of Mr. McNair's second assignment of error.

The driver eventually abandoned the motorcycle at a barbed wire fence along woods near a river. He then quickly scaled the fence and disappeared into the woods.

{¶16} The detective further testified that, a couple of days after the incident, he arrested Mr. McNair after the officers' investigation led to his legal name, and they received a tip as to his address.[2] The detective maintained that Mr. McNair spoke with detectives about the shooting, but he changed his account of the incident three times. First, Mr. McNair stated that he was shooting dice with Mr. Carroll and others, and Mr. Carroll lost money, got angry, and pushed Mr. McNair. Mr. McNair pushed him back, and a fight ensured. When he became aware the police were coming, everyone ran from the area, and he called his brother, Terrell Fennell, who picked him up in a black Mountaineer SUV and took him home. He denied there being any gunshots or that a gun was involved in the fight. However, after the officers put Mr. McNair in a holding cell to await transportation to the county jail, but prior to transporting, he called out to one of the detectives and asked to speak with them again. During this account of the incident, Mr. McNair acknowledged that he had heard a gunshot, but he continued to maintain that he left the scene in a black Mountaineer. Upon further questioning, he then stated that Mr. Carroll had produced a handgun, and there was a fight over the handgun, and Mr. Carroll had the gun in his right hand. Mr. McNair stated that the gun went off when it was pointing down toward the ground, and there was only one shot, and that was all he heard, and he ran. At that point he acknowledged that he had left the area on a yellow motorcycle.

---

[2] Another officer, Detective Eric Grove, testified as to out-of-court identifications of Mr. McNair made during the police investigation. Mr. McNair also challenges this testimony in his second assignment of error. As this testimony is also unnecessary to our resolution of the first assignment of error, we defer our discussion of the out-of-court identifications until our discussion of the second assignment of error.

{¶17} During Detective Groomes' testimony, over objection of the defense, the State played recordings of telephone calls made by Mr. McNair from jail, and these recordings were entered into evidence.[3] The detective maintained that Mr. McNair had a distinctive voice, which the detective recognized on the recordings. In one of these calls, Mr. McNair called a woman, who asked what he had done. In the recording, the audio of Mr. McNair is somewhat difficult to hear, but it sounds as though he responded, "I shot a motherf***er." The woman replied, "[H]uh[?]" Mr. McNair responded that he had shot somebody. Later in the call, Mr. McNair stated that he had broken his finger, and the woman asked how he had done that, and he responded that it was from "running from the damn police."

{¶18} The other call was between Mr. McNair and his brother, Terrell Fennell. The detective recognized Mr. Fennell's telephone number as a number previously provided by Mr. Fennell to the police department, and he recognized Mr. Fennell's voice because he was familiar with Mr. Fennell. It is difficult to understand portions of this recording, but during the call, it sounds as though Mr. Fennell indicates that he had told someone about the incident, that Mr. McNair should not choose a jury trial, and that the trial court judge was "sweet[.]" Mr. McNair indicates that if the witnesses come to testify against him, the case is over. It sounds as though Mr. Fennell calls a third party to attempt to get ahold of another individual, and during the call tells the third party to get a hold of people to make sure they do not appear at court.

{¶19} On cross-examination, the detective confirmed that people could flee from police for reasons other than involvement in a crime, such as having outstanding warrants. He also confirmed that the officers never recovered the gun involved in this incident. In addition, the

---

[3] These recordings and corresponding print-out sheets containing the date, time, and telephone number dialed, were identified by other witnesses previous to Detective Groomes' testimony.

detective acknowledged that, when Mr. McNair stated on the telephone call with the unidentified woman that he had shot someone, he did not indicate whether he did it accidentally. Further, on the recording of that call, Mr. McNair, after twice saying he had shot someone, then qualifies the statement by indicating that was what "they are trying to say I" did.

{¶20} A forensic scientist from the Ohio Bureau of Criminal Identification testified that she received a gunshot residue kit which purported to contain samples taken from Mr. Carroll's hands. She explained that the presence of gunshot primer residue on a person's hands could indicate that the person has recently fired a gun. After testing the samples, she determined that particles highly indicative of gunshot primer residue were not contained in the kit. On cross-examination, she indicated that washing hands or receiving medical treatment could remove gunshot primer residue from the shooter's hands.

{¶21} The defense presented the testimony of two individuals who maintained that they were present during the incident: Anthony Rodgers, and Mr. Fennell.

{¶22} Mr. Rodgers testified that he was at the dice game, and he saw Mr. Carroll there, and he appeared upset and mad. Once Mr. Carroll started losing at dice, he became angry and began calling people names "and saying this and that. And before you know it, he kicked [Mr. McNair]. * * * After he kicked him, they got in a tussle a little bit." Mr. Rodgers then "heard a gun go off and everybody just ran." Mr. Rodgers could not tell who was holding the gun that went off.

{¶23} On cross-examination, Mr. Rodgers recalled that Mr. Carroll kicked Mr. McNair close to his face, but could not recall which leg he used and was not sure precisely where the kick landed or how hard it was. He did not know how many shots were fired that night.

{¶24} Mr. Fennell testified that he is Mr. McNair's brother, and he was present at the dice game, along with several other individuals, including Mr. McNair, Mr. Carroll, a man known as "Worm," and Ms. Adams. Mr. Fennell maintained that he did not know Ms. Adams very well, but he had known her to associate with Mr. McNair, and his understanding was that there had been a sexual relationship between them a few weeks before the incident. At the dice game, "[t]here was words (sic.)" when Mr. Carroll lost the dice to Mr. McNair. Mr. McNair rolled the dice twice, and on his third roll, when Mr. McNair was leaning down "to pick the dice up, [Mr. Carroll] threw a kick." The men then started wrestling, and a couple of punches were thrown between them. At one point, Mr. McNair fell to the ground and got back up, and the men started wrestling again. Mr. Fennell then heard gunshots, but he did not see a gun. He ran, and while running, he heard another gunshot. He left on foot, and went home, which was not far at the time.

{¶25} In his brief, Mr. McNair urges that his convictions were against the weight of the evidence. He maintains that only Ms. Adams testified that she saw Mr. McNair with the gun, and the trial court had no "rational basis to believe only one eye[w]itness," because there was no evidence presented concerning the details of her separation from Mr. Carroll and there was no evidence presented that Ms. Adams and Mr. Carroll did not "conspire[]" to blame Mr. McNair for the shooting. Mr. McNair speculates that Mr. Carroll, whom the defense witnesses testified was angry on the night at issue, could have pulled out a gun and inadvertently shot himself, and that Ms. Adams may have been disingenuous in her testimony in order to protect him.

{¶26} However, this Court has observed that the finder of fact "is best able to judge the credibility of witnesses because it is present to 'view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the

proffered testimony.'" *Persinger*, 2014-Ohio-4125, at ¶ 18, quoting *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993). "A conviction is not against the manifest weight because the jury chose to credit the State's version of events." *Persinger* at ¶ 18, quoting *State v. Peasley*, 9th Dist. Summit No. 25062, 2010-Ohio-4333, ¶ 18. We cannot say the trial court erred in relying on Ms. Adams' testimony, especially where Mr. McNair's challenges to her credibility are primarily based upon speculation.

{¶27} Mr. McNair further argues that the statements made on the recorded jail calls were inconclusive as to their meanings. He maintains that his statements that he had shot someone may have meant only that this was the allegation forming the basis of his charges, not that he actually had shot someone, or he could have meant that he accidentally had shot someone. He further argues that the call between himself and his brother did not indicate that he was the perpetrator, but instead involved trial strategy. However, regardless of the interpretation given to Mr. McNair's statements on the recorded calls, the trial court could have credited Ms. Adams' testimony. This is especially true here, where the evidence of Mr. McNair fleeing from the scene and the location of Mr. Carroll's gunshot wound are consistent with Ms. Adams' account of the events.

{¶28} Based upon our review of the record, we conclude that this is not the exceptional case where the trial court created a manifest miscarriage of justice in finding Mr. McNair guilty of the charges. Accordingly, Mr. McNair's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED TO THE DETRIMENT OF [MR. MCNAIR] WHEN IT ALLOWED INTO EVIDENCE THE STATEMENTS OF THE PERSON WHO WAS SHOT WITHOUT THAT PERSON BEING PRESENT FOR CROSS-EXAMINATION. THE COURT ERRED TO THE DETRIMENT

OF [MR. MCNAIR] BY ALLOWING POLICE OFFICER TO EXTENSIVELY TESTIFY ABOUT THE OUT-OF-COURT IDENTIFICATION OF [MR. MCNAIR].

{¶29} In his second assignment of error, Mr. McNair argues that the trial court erred in allowing testimony concerning Mr. Carroll's out-of-court statements given at the scene, and his out-of-court identification of Mr. McNair from a photo line-up, because the admission of this evidence violated the Confrontation Clause, and these statements consisted of inadmissible hearsay.

{¶30} In regard to Mr. Carroll's statements at the scene, on redirect examination of Officer Merrill, the following exchange occurred:

[THE STATE]: * * *. When you interviewed Mr. Carroll on scene, how was he? What was he like? Was he upset? Was he hurt? What did you see?

[OFFICER MERRILL]: He was hurt. He was hurt. He was emotional. In dealing with his injury, he was definitely in a lot of pain.

[THE STATE]: And the first – and after he told you he was shot, was the next thing he told you about who shot him?

[OFFICER MERRILL]: Yes.

[THE STATE]: What did he tell you?

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Sustained.

[THE STATE]: Your Honor, I think its excited utterance.

[THE COURT]: All right. Go ahead. We'll take it for what it's worth.

[OFFICER MERRILL]: Okay. Mr. Carroll told me that one of the individuals that was throwing the dice with him, his name was Balla, and he referred to him as his street name as Balla. And he told me he didn't know what his actual name was, he just knew him as Balla, and that he had a tattoo on his arm that said Balla, and that was the individual that shot him.

And he also told me that after he shot him, that the next time he seen him was on a motorcycle headed out of the complex and he pointed a gun at him. But he said he did not shoot at him.

[THE STATE]:  He did not shoot at him as he was?

[OFFICER MERRILL]: Leaving on the motorcycle.

[THE STATE]: But he said this is the guy who shot me?

[OFFICER MERRILL]: Yeah.

{¶31}  With respect to Mr. Carroll's out-of-court identification of Mr. McNair from a photo array, this testimony was elicited from Detective Eric Grove.[4]  Detective Grove administered the photo lineups, which were submitted as exhibits.  Detective Grove indicated that Mr. Carroll pointed to the photograph of Mr. McNair, "and advised that's Balla, that's the one who shot me."  The defense counsel objected as to what he said, and the trial court again replied that it would "take it for what it's worth."

{¶32}  Therefore, the evidence challenged in the second assignment of error pertains to Mr. Carroll's identification of Mr. McNair as the person who shot him, and to Mr. McNair leaving the scene on a motorcycle.  The trial court was unclear in its rulings on the objections to the challenged testimony as to whether it would consider the testimony, as it noted in both instances that it would "take it for what it's worth."  To the extent that the trial court did consider the testimony in reaching its decision, the State has maintained, in part, that any error in admitting this evidence was harmless.

{¶33}  Challenges to evidence based upon the Confrontation Clause and hearsay are subject to a harmless-error analysis.  *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 21 (noting harmless error analysis appropriate in reviewing hearsay and Confrontation

---

[4] In his brief, Mr. McNair maintains that Donna Schwesinger was improperly permitted to testify as to Mr. Carroll's identification of Mr. McNair from the photo array.  However, Ms. Schwesinger testified as the forensic scientist from the Ohio Bureau of Criminal Identification.  The testimony cited by Mr. McNair was actually elicited from Detective Eric Grove.  Therefore, we conclude that Mr. McNair merely misidentified the testifying witness in his brief, and we proceed to review Detective Grove's testimony.

Clause challenges). "Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.'" *State v. Harris*, 142 Ohio St.3d 211, 220, 2015-Ohio-166, ¶ 36. The following analysis has been established by the Ohio Supreme Court "to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial." *Id.* at ¶ 37. "First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict." *Id.* at ¶ 37, citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 25, 27. "Second, it must be determined whether the error was not harmless beyond a reasonable doubt." *Harris* at ¶ 37, citing *Morris* at ¶ 28. "Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt." *Harris* at ¶ 37, citing *Morris* at ¶ 29, 33.

{¶34} Here, Ms. Adams identified Mr. McNair in court as the individual who attempted to rob Mr. Carroll at gunpoint, and who thereafter shot Mr. McNair before fleeing on a motorcycle. The location of the Mr. Carroll's wound, and Mr. McNair's flight from the scene, are consistent with Ms. Adams' account of the incident. Consequently, we conclude that the remaining evidence established Mr. McNair's guilt beyond a reasonable doubt. *See Harris* at ¶ 37. Accordingly, any error in admission of this evidence was harmless, and we must disregard it pursuant to Crim.R. 52(A). Accordingly, Mr. McNair's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED TO THE DETRIMENT OF [MR. MCNAIR] WHEN IT ALLOWED INTO EVIDENCE A PHONE CALL BETWEEN [MR. MCNAIR] AND AN UNKNOWN FEMALE WHEN THE FEMALE WAS NOT PRESENT FOR CONFRONTATION.

**{¶35}** In his third assignment of error, Mr. McNair argues that the trial court erred in admitting into evidence the jailhouse phone call between himself and the unidentified woman because it violated the Confrontation Clause. We disagree.

**{¶36}** "Questions of the scope and effect of constitutional protections, such as the Sixth Amendment, are matters of law and therefore reviewed de novo." *State v. Myers*, 9th Dist. Summit No. 25737, 2012-Ohio-1820, ¶ 21. "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]'" *Myers* at ¶ 21. "The right of confrontation requires, whenever possible, testimony and cross-examination to occur at trial." *Myers* at ¶ 21, citing *State v. Allen*, 8th Dist. Cuyahoga No. 82556, 2004-Ohio-3111, ¶ 17. "[T]his procedural guarantee applies to both federal and state prosecutions." *Myers* at ¶ 21, citing *Crawford v. Washington*, 541 U.S. 36 (2004).

**{¶37}** In *Crawford*, the United States Supreme Court held that the Confrontation Clause bars the admission of "testimonial" hearsay unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine him. *Id.* at 68-69. The *Crawford* Court limited its holding to "testimonial" hearsay. *See id.* at 68. Unless the statement at issue is "testimonial," *Crawford* does not govern its admissibility. *Id.*

**{¶38}** To determine if a statement was testimonial, courts must consider if the "primary purpose" of the statement was testimonial. *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173, 2180 (2015). A statement is testimonial where it was given with the "primary purpose of creating an out-of-court substitute for trial testimony." *Clark* at 2183, quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

**{¶39}** Mr. McNair appears to very broadly argue that the admission of the jailhouse call between him and the unidentified female violates the Confrontation Clause because he was not able to cross-examine her. However, he identifies no testimonial statement made by the unknown female that would implicate the Confrontation Clause. We decline to construct an argument on his behalf. *See* App.R. 16(A)(7). Nonetheless, we note that the unidentified woman made very few "statements" during the call, and she instead primarily asked Mr. McNair questions. It was his answers that provided substantive evidence against him.

**{¶40}** Accordingly, Mr. McNair's third assignment of error is overruled.

III.

**{¶41}** Mr. McNair's assignments of error are overruled. The judgment of the trial court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

HENSAL, P. J.
SCHAFER, J.
CONCUR.


APPEARANCES:

KENNETH N. ORTNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.