[Cite as *State v. Weaver*, 2018-Ohio-2998.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

STATE OF OHIO

    Appellee

    v.

WILLIAM WEAVER

    Appellant

C.A. No.    17CA0092-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    16CR0487

DECISION AND JOURNAL ENTRY

Dated: July 30, 2018

CALLAHAN, Judge.

{¶1} Defendant-Appellant, William Weaver, appeals from the judgment of the Medina County Court of Common Pleas, committing him to an in-patient psychiatric facility. This Court affirms.

I.

{¶2} The police arrested Mr. Weaver after a seven-year-old girl told her family that he had hugged her, kissed her, and forced his tongue into her mouth on several occasions. He was indicted on two counts of kidnapping and two specifications alleging that he had acted with a sexual motivation. Following a brief period of discovery, his appointed counsel requested a competency evaluation, and the trial court referred him to the Psycho-Diagnostic Clinic of Summit County. Dr. Michael Biscaro, a psychologist at the clinic, conducted Mr. Weaver's evaluation and issued a written report. He reported that Mr. Weaver suffered from a mild intellectual disability and was incompetent to stand trial. Even so, he opined that there was a

substantial probability Mr. Weaver's competency could be restored if he received treatment. The parties stipulated to his findings, and, based on his report, the court ordered Mr. Weaver to undergo competency restoration treatment at Heartland Behavioral Healthcare.

{¶3} After six months of treatment at Heartland Behavioral Healthcare, Dr. Phillip Seibel reevaluated Mr. Weaver's competency and issued a written report. He reported that Mr. Weaver suffered from an intellectual disability and remained incompetent to stand trial. Additionally, he reported that there was not a substantial likelihood Mr. Weaver's competency could be restored within the statutorily allotted time period. Dr. Seibel initially recommended that Mr. Weaver remain at Heartland Behavioral Healthcare for inpatient treatment, should the court find him incompetent and unrestorable. Subsequently, however, he amended his report based on his further review of what he believed to be the applicable statutory law. In the amended version of his report, he recommended that, if found incompetent and unrestorable, Mr. Weaver undergo a separate intellectual disability evaluation to determine whether he was subject to institutionalization.

{¶4} The parties stipulated to the findings in Dr. Seibel's report, and, consistent with that report, the court found Mr. Weaver incompetent and unrestorable. Upon motion of the State, the court then held a hearing to determine whether it was appropriate to retain jurisdiction over Mr. Weaver and commit him to a mental health facility. Although Dr. Seibel testified at the hearing, he indicated that, by statute, he was not qualified to offer an opinion as to whether Mr. Weaver was subject to institutionalization. Consistent with his amended report, he recommended that Mr. Weaver undergo an additional evaluation to address that issue. The trial court ultimately adopted his recommendation and ordered Mr. Weaver to undergo a separate intellectual disability evaluation.

{¶5} Dr. Daniel Cowan, a Psychology Director for the Ohio Department of Developmental Disabilities, conducted Mr. Weaver's intellectual disability evaluation and issued a written report. The trial court then set the matter for an additional hearing on the issue of institutionalization. Consistent with his written report, Dr. Cowan testified at the hearing that Mr. Weaver suffered from a mild intellectual disability, but was not an individual who required institutionalization by court order. He, therefore, recommended that Mr. Weaver receive ongoing support and assistance from the Department of Developmental Disabilities in a community-based setting. At the close of the hearing, the court ordered the parties to file written closing arguments.

{¶6} Upon review of the written arguments and evidence presented, the court issued its judgment. The court determined that the State set forth clear and convincing evidence that Mr. Weaver (1) had committed the offenses with which he was charged, (2) suffered from a moderate intellectual disability, and (3) suffered from a mental illness. Based on those determinations and the totality of the circumstances, the court found that Mr. Weaver was subject to institutionalization by court order. Consequently, it ordered him committed to Heartland Behavioral Healthcare.

{¶7} Mr. Weaver now appeals from the trial court's judgment and raises three assignments of error for this Court's review.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED BY FINDING BY CLEAR AND CONVINCING EVIDENCE THAT MR. WEAVER COMMITTED THE OFFENSES IN THE INDICTMENT, AND BY PERMITTING THE ALLEGED CHILD VICTIM'S STATEMENTS INTO EVIDENCE, OVER OBJECTION, IN VIOLATION OF EVID.R. 601(A), 802, AND 807.

{¶8}   In his first assignment of error, Mr. Weaver argues that the trial court erred when it admitted the statements of S.W., the seven-year-old he allegedly kidnapped, through the testimony of a social worker.  He further argues that the court erred when it relied on those statements and found, by clear and convincing evidence, that he committed his charged offenses.  For the reasons that follow, this Court rejects his arguments.

{¶9}   In certain instances, R.C. 2945.39 authorizes a trial court to retain jurisdiction over an incompetent defendant and commit him to the care of a treatment facility.  *See* Discussion, *infra*, under Assignment of Error No. 2.  One prerequisite is that the court must be able to find, by clear and convincing evidence, that the defendant committed the violent first- or second-degree felony with which he was charged.  *See* R.C. 2945.39(A)(2)(a).  *See also* R.C. 2945.38(C)(1)(b).  "In making its determination * * *, the court may consider all relevant evidence * * *."  R.C. 2945.39(B).

{¶10}  The decision to admit or exclude evidence lies in the sound discretion of the trial court.  *State v. Sage*, 31 Ohio St.3d 173, 180 (1987).  "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review."  *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6.  *See also State v. Walters*, 9th Dist. Summit No. 28582, 2018-Ohio-1175, ¶ 32.  An abuse of discretion indicates that the court's attitude was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court.  *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶11}  "This Court has recognized repeatedly that 'statements made to social workers for the purpose of facilitating medical treatment are admissible under the medical exception to

hearsay' even where the child has not been determined competent to testify." *In re T.L.*, 9th Dist. Medina No. 09CA0018-M, 2011-Ohio-4709, ¶ 15, quoting *In re I.W.*, 9th Dist. Wayne Nos. 07CA0056, 07CA0057, 2008-Ohio-2492, ¶ 17. *See also State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, syllabus. Evid.R. 803(4) pertains to statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "To determine whether statements are admissible under [that rule], a court must look to the primary purpose of the statements." *State v. Just*, 9th Dist. Wayne No. 12CA0002, 2012-Ohio-4094, ¶ 19.

{¶12} Statements made for the primary purpose of medical diagnosis or treatment are nontestimonial and, therefore, admissible under Evid.R. 803(4). *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 28. Conversely, statements made for the primary purpose of forensic investigation are testimonial, *id.*, and admissible only if "the declarant is unavailable and the accused has had a prior opportunity to cross-examine him [or her]." *State v. McNair*, 9th Dist. Lorain No. 13CA010485, 2015-Ohio-2980, ¶ 37, citing *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). "Considerations that should be taken into account in making [a primary purpose] determination include the manner in which the child was questioned, whether there was a motive to fabricate, and whether the child understood the need to tell the truth." *Walters* at ¶ 33, citing *Muttart* at ¶ 49. The court also may consider "the child's age and whether the proper protocol for interviewing children alleging sexual abuse was followed." *Walters* at ¶ 33, citing *Muttart* at ¶ 49.

{¶13} Initially, this Court pauses to address the application of the Ohio Rules of Evidence in this matter. According to the parties, no Ohio appellate court has yet decided

whether the Ohio Rules of Evidence apply in the context of commitment proceedings that occur pursuant to R.C. 2945.39. The State argues that the rules are inapplicable because a proceeding under R.C. 2945.39 is more akin to a "miscellaneous criminal proceeding" such as sentencing. *See* Evid.R. 101(C)(3). Meanwhile, Mr. Weaver asks this Court to apply the rules and follow, by logical extension, the Ohio Supreme Court's decision in *State v. Jones*, 9 Ohio St.3d 123 (1984). Though both parties have invited this Court to decide this issue, this Court need not do so to resolve this appeal. *See, e.g., State v. Adamson*, 83 Ohio St.3d 248, 250-251 (1998). That is because, even if the rules apply, Mr. Weaver's assignment of error fails on its merits.

{¶14} In support of its argument that the trial court ought to commit Mr. Weaver, the State presented the testimony of Emily Justice, a caseworker from Medina County Children Services. Ms. Justice testified that she is a universal caseworker, meaning that she remains with a case "from beginning to end * * *." She stated that, when she receives notice of a complaint or referral, she initiates contact with the family at issue to complete certain assessments, such as a safety assessment to address any safety concerns. She first became aware of S.W., the victim in this matter, when she received a call about possible sexual abuse. In particular, she testified that there were allegations of "multiple incidents of [Mr. Weaver] kissing [S.W.] with his tongue * * *."

{¶15} Ms. Justice testified that she normally would interview a child of S.W.'s age at her department's child advocacy center. In this particular instance, however, she interviewed S.W. in one of the interview rooms at the Medina City Police Department. Ms. Justice testified that the interview occurred there because S.W.'s mother would not respond when she repeatedly called her and attempted an unannounced home visit. Ms. Justice explained that she already had an open case with S.W.'s mother due to a separate concern, so the implication was that S.W.'s

mother was avoiding her. Ms. Justice testified that she had a conversation with a detective, feeling "that he [might] have more luck being able to schedule with [S.W.'s mother] * * *." That proved to be the case, so Ms. Justice interviewed S.W. at the police station when her mother brought her there.

{¶16} Ms. Justice described S.W. as friendly and "matter of fact" when she met with her. She indicated that, when S.W. sat down for their interview, S.W. said "she had come to tell [Ms. Justice] about being molested." S.W. told Ms. Justice that Mr. Weaver was a friend of her mother's and, on a number of occasions, he had kissed her. Ms. Justice then began to describe three different incidents during which Mr. Weaver had kissed S.W. At that point, Mr. Weaver objected on the basis of hearsay, and the State responded that S.W.'s statements were admissible pursuant to Evid.R. 803(4). The court then overruled the objection, and Ms. Justice continued to testify without further objection.

{¶17} Ms. Justice relayed the three incidents that S.W. described to her. During the first incident, Mr. Weaver was helping S.W. clean her room when he hugged her, pressed his chest "as well as his private part" against her, kissed her on the lips, and then "put his tongue inside her mouth and wiggled it around." S.W. indicated that, when Mr. Weaver hugged her, he pinned her arms to her sides such that she was unable to move. During the second incident, S.W. and Mr. Weaver were on the first floor of her home nearby a mattress that she and Mr. Weaver sometimes jumped on. Mr. Weaver then lifted up S.W., held her there, and kissed her five times. S.W. indicated that a few of the kisses were closed-mouth, but other kisses "were with an open mouth where his tongue was put [into] her mouth." During the third incident, S.W. and Mr. Weaver were in the kitchen at her home when he kissed her. Ms. Justice could not recall if S.W. described Mr. Weaver as using his tongue on that particular occasion. She indicated, however,

that S.W. described Mr. Weaver using his tongue "most of the time" when he kissed her. S.W. described Mr. Weaver's tongue as "wet and slobbery." She also stated that "it tasted awful and * * * she still had that taste in her mouth."

{¶18} Ms. Justice testified that she conducted S.W.'s interview outside the presence of a caregiver because she did not want S.W. to be influenced or hesitate to tell her things during their interview. She testified that she had undergone Beyond the Silence training, as well as additional sexual abuse and forensic interview trainings. She indicated that a few of the things S.W. said during her interview, such as the fact that she used the word "molested," led her to believe that S.W. might "have been influenced by overhearing conversations with adults * * *." Even so, she testified that she "felt that [S.W.'s] disclosure and the details of her interaction with [Mr. Weaver] were truthful."

{¶19} Mr. Weaver argues that the trial court erred by admitting S.W.'s statements through Ms. Justice because the statements were not admissible under Evid.R. 803(4). According to Mr. Weaver, S.W.'s interview was conducted at the police station, in the presence of a police officer, so her statements were not elicited for the purpose of medical treatment. He further argues that, in the absence of her statements, there was not clear and convincing evidence to support the conclusion that he committed his charged offenses.

{¶20} Contrary to Mr. Weaver's assertion, it is entirely unclear from the record whether Ms. Justice conducted her interview with S.W. in the presence of a police officer. Though a detective arranged the interview and it took place at a police station, there was no testimony to establish that the detective or any other officer participated in or was present at the actual interview. Mr. Weaver essentially asks this Court to infer that fact from the location of the interview, but "this Court will not engage in speculation." *State v. Moreland*, 9th Dist. Summit

No. 27910, 2016-Ohio-7588, ¶ 34. Likewise, this Court will not conclude that Ms. Justice elicited S.W.'s statements for a forensic purpose solely because she interviewed her at a police station. *See Michigan v. Bryant*, 562 U.S. 344, 366 (2011) (formality of an encounter "is not the sole touchstone of [a] primary purpose inquiry").

**{¶21}** Ms. Justice explained that the only reason S.W.'s interview occurred at a police station was that she had to rely on a detective to arrange it. *See Ohio v. Clark*, 576 U.S. ___, 135 S.Ct. 2173, 2180 (2015), quoting *Bryant* at 369 (in conducting primary purpose inquiry, a court "must consider 'all of the relevant circumstances'"). She specifically testified that, but for the trouble she had contacting S.W.'s mother, the interview would have taken place at a child advocacy center. The interview constituted Ms. Justice's first contact with S.W., and, at that point, she was aware that the girl might have been a victim of sexual abuse. Ms. Justice testified that she had been trained to interview victims of sexual abuse and, when first meeting with victims or their families, she conducted a variety of assessments, including a safety assessment. Accordingly, while S.W.'s interview occurred at a police station, the record does not support the conclusion that it differed in any material way from the type of interview that Ms. Justice would have conducted at a child advocacy center.

**{¶22}** The Ohio Supreme Court has recognized that child advocacy center interviews are conducted "with the purpose of gathering as much information as possible in a single setting to reduce the trauma child-abuse victims may suffer as a result of having to recount their abuse multiple times." *See Just*, 2012-Ohio-4094, at ¶ 21, citing *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, at ¶ 30-31. The result is that interviewers play a dual role and the same interview may result in the interviewer eliciting both testimonial and nontestimonial statements. *See Arnold* at ¶ 33. While statements elicited primarily for the purpose of medical

diagnosis/treatment are admissible (i.e., nontestimonial), statements elicited primarily for the purpose of forensic investigation are subject to the Confrontation Clause (i.e., testimonial). *Id* at paragraphs one and two of the syllabus. The question, therefore, is not whether all of an interviewee's statements, taken together, are or are not admissible. Individual statements may serve distinct purposes, and thus, the admissibility of any individual statement depends upon the distinct purpose for which it was elicited. *See id.* at ¶ 34-44.

{¶23} When objecting to Ms. Justice's testimony in the lower court, Mr. Weaver only indicated that he was objecting on the basis of hearsay. He did not reply to the State's argument that the testimony was admissible under Evid.R. 803(4). He also never renewed his objection to clarify its basis or to assert that any of S.W.'s individual statements were not elicited for the purpose of medical diagnosis or treatment. Likewise, on appeal, he only argues that Ms. Justice's testimony, as a whole, was inadmissible because she interviewed S.W. for a forensic purpose. He makes no attempt to examine any of S.W.'s individual statements or apply any of the factors relevant to a primary purpose inquiry. *See Walters*, 2018-Ohio-1175, at ¶ 33, citing *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, at ¶ 49. Accordingly, in conducting the analysis set forth herein, this Court is mindful of the extremely limited nature of both his objection in the court below and his argument on appeal. *See Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out.").

{¶24} Upon review, the trial court did not abuse its discretion when it found that the vast majority of the statements Ms. Justice elicited from S.W. were made for the purpose of medical diagnosis or treatment. *See* Evid.R. 803(4). This Court has held that statements identifying a perpetrator, describing instances of abuse, and describing the manner in which the perpetrator

touched the victim's body are all admissible as statements made for the purpose of medical diagnosis and treatment. *See Just* at ¶ 22, citing *In re T.L.*, 2011-Ohio-4709, at ¶ 17 and *In re I.W.*, 2008-Ohio-2492, at ¶ 18-22. The vast majority of S.W.'s statements described the ways in which Mr. Weaver touched her and how that made her feel. S.W. was only seven years old at the time of her interview, and the record does not disclose that she had any apparent motive to fabricate. *See Walters* at ¶ 33. Ms. Justice stated that she purposely interviewed S.W. outside the presence of a caregiver so that she would not be influenced, and the record does not contain any indication that she questioned S.W. in a suggestive manner. *See id.* It also does not contain any indication that S.W. did not understand the need to tell the truth. *See id.* To the contrary, Ms. Justice indicated that she believed S.W. gave an honest account of her interactions with Mr. Weaver. Even if certain portions of their interview served a forensic purpose, Mr. Weaver has not shown that S.W.'s statements about his identity and the alleged abuse she suffered were inadmissible under Evid.R. 803(4). Accordingly, we reject his argument to the contrary.

{¶25} Mr. Weaver also argues that the court erred when it found, by clear and convincing evidence, that he committed his charged offenses. *See* R.C. 2945.39(A)(2)(a). His argument, however, is premised upon his having successfully proven that Ms. Justice's testimony was inadmissible. Because this Court has reached the opposite conclusion, his argument lacks merit. S.W.'s statements, as introduced through Ms. Justice, constituted clear and convincing evidence that Mr. Weaver forcibly restrained S.W. on at least two occasions for the purpose of kissing her and inserting his tongue into her mouth while doing so. *See* R.C. 2905.01(A)(4) and (B)(2). As such, Mr. Weaver's first assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 2**

THE TRIAL COURT ERRED BY FINDING BY CLEAR AND CONVINCING
EVIDENCE THAT MR. WEAVER IS A MENTALLY ILL PERSON SUBJECT

TO COURT ORDER, AS REQUIRED BY R.C. § 2945.39(A)(2)(b) AND AS DEFINED BY R.C. §§ 5122.01(A) AND (B).

**{¶26}** In his second assignment of error, Mr. Weaver challenges the trial court's determination that he is subject to court order because he suffers from a mental illness. He argues that the State failed to prove, by clear and convincing evidence, that he suffers from a mental illness, represents a substantial/grave risk to others, or is presently dangerous. This Court disagrees.

**{¶27}** "Under R.C. 2945.38(B)(1) and (C)(1), a common pleas court presiding over a criminal case involving a defendant charged with a violent first- or second-degree felony who has been found incompetent to stand trial pursuant to R.C. 2945.37 may require the defendant to undergo treatment for up to one year." *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, ¶ 11. If the defendant does not respond to the treatment and remains incompetent, the law authorizes two distinct paths forward. *See* R.C. 2945.38(H)(3) and 2945.39(A). The first is that the court or prosecutor may petition the probate court to commence civil commitment proceedings. *Williams* at ¶ 12, citing R.C. 2945.39(A)(1). The second is that the court or prosecutor "may seek to have the common pleas court retain jurisdiction over the defendant." *Williams* at ¶ 12, citing R.C. 2945.39(A)(2). It is undisputed that the State moved the court to retain jurisdiction over Mr. Weaver after the treatment he received to restore his competency proved unsuccessful.

**{¶28}** A court may retain jurisdiction over a defendant if, following a hearing, it determines by clear and convincing evidence that: (1) the defendant committed the charged offense (i.e., the violent first- or second-degree felony), R.C. 2945.39(A)(2)(a); and (2) the defendant is either "a mentally ill person subject to court order" or "a person with an intellectual disability subject to institutionalization by court order." R.C. 2945.39(A)(2)(b). *Accord*

*Williams* at ¶ 13. "The trial court has 'broad discretion' as to what to review in making [its] determinations * * *." *State v. Decker*, 10th Dist. Franklin No. 16AP-684, 2017-Ohio-4266, ¶ 30, quoting *In re Burton*, 11 Ohio St.3d 147, 149 (1984). By statute, it may consider "all relevant evidence, including, but not limited to, any relevant psychiatric, psychological, or medical testimony or reports, the acts constituting the offense charged, and any history of the defendant that is relevant to the defendant's ability to conform to the law." R.C. 2945.39(B).

**{¶29}** The phrases "mental illness" and "mentally ill person subject to court order" are statutorily defined terms of art. *See* R.C. 5122.01(A) and (B). *See also* R.C. 2945.37(A)(7). A "mental illness" is "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." Meanwhile, the phrase "mentally ill person subject to court order" includes a defendant who, due to his or her mental illness:

> (2) Represents a substantial risk of physical harm to others as manifested by evidence of recent * * * violent behavior * * * or other evidence of present dangerousness; [or]
>
> * * *
>
> (4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person * * *.

R.C. 5122.01(B)(2) and (4). The Ohio Supreme Court has instructed trial courts, in assessing whether a defendant is a mentally ill person subject to court order, to consider the totality of the circumstances. *See Williams* at ¶ 13, citing *In re Burton* at paragraph one of the syllabus. *See also In re Burton* at 149-150 (outlining a variety of factors for the court to consider in conducting its totality of the circumstances analysis).

**{¶30}** If a trial court determines that the State has set forth clear and convincing evidence to satisfy the elements of R.C. 2945.39(A)(2)(a) and (b), "the court shall commit the

defendant." R.C. 2945.39(D)(1). The defendant must be placed "in the least-restrictive commitment alternative available consistent with public safety and the defendant's welfare * * *." *Williams* at ¶ 15, citing R.C. 2945.39(D)(1). In making its determination as to the least-restrictive commitment, "the court shall consider the extent to which the [defendant] is a danger to [himself] and to others, the need for security, and the type of crime involved * * *." R.C. 2945.39(D)(1). The statute provides that the court must "give preference to protecting public safety." *Id. Accord Williams* at ¶ 15.

{¶31} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). If an appellant challenges the weight of the evidence, a reviewing court will apply the weight of the evidence standard set forth in *State v. Thompkins*, 78 Ohio St.3d 380 (1997), while remaining "mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21. *See also In re P.A.*, 10th Dist. Franklin No. 17AP-728, 2018-Ohio-2314, ¶ 13.

{¶32} The trial court determined that Mr. Weaver was a mentally ill person subject to court order. It noted that his charges were extremely serious and stemmed from multiple incidents, involving a seven-year-old girl. The court found that, during those incidents, Mr. Weaver hugged the girl, pressed his body against her, and kissed her by placing his tongue in her mouth. Although Mr. Weaver later apologized for his behavior when the police asked him to complete a written statement, the court found that he had no appreciation for the seriousness of

his conduct. The court noted that there was evidence Mr. Weaver suffered from limited insight and judgment, had problems recognizing boundary issues, and was fixated "on reducing his bond, getting back to normal life and [believing/hoping] his charges would just be dropped and go away." The court found that Mr. Weaver suffered from intellectual deficiencies and, under these facts and circumstances, those deficiencies "manifested in such a way that he [met] the definition of mental illness in R.C. 5122.01(A)." It also found that, due to his inability to understand the seriousness of his behavior, Mr. Weaver represented a substantial risk of physical harm to others. Based on those findings, it concluded that he was a "mentally ill person subject to court order" under R.C. 5122.01(B).

{¶33} This Court begins by outlining the evidence that the trial court received in this matter. Dr. Biscaro evaluated Mr. Weaver for competency and opined that a mild intellectual disability rendered him incompetent. The doctor reported that Mr. Weaver lived with his father until 2013 when his father became critically ill and the Medina Board of Developmental Disabilities ("the Board") assisted Mr. Weaver in obtaining his own apartment. The doctor indicated that Mr. Weaver did not have a history of mental health treatment, but had "exhibited periods of mood disturbance" in the past and twice had been evaluated for psychiatric admission when he reported feeling suicidal. He indicated that the Board conducted a functional assessment in 2012 and found that Mr. Weaver "functioned fairly independently in self-care[,]" but required prompts for things like hygiene and household chores. He opined that Mr. Weaver's difficulties "seem[ed] to be related primarily to his intellectual deficits, poor coping skills, and limited insight/judgment." As to Mr. Weaver's criminal charges, he reported that Mr. Weaver "did not understand [their] relative seriousness" and "had some difficulty describing what he was accused of doing." He described Mr. Weaver's "appraisal of the entire

situation/outcome [as] unrealistic" and noted that he was simply "fixat[ed] on reducing his bond, getting back to normal life and [believing/hoping] his charges would just be dropped and go away."

{¶34} Dr. Seibel also evaluated Mr. Weaver's competency after having had the opportunity to observe him for six months. He ultimately concluded that Mr. Weaver suffered from an intellectual disability rather than a mental illness. He reported that there was no evidence Mr. Weaver suffered from a mood or thought disorder, but "at times he [had] shown a lack of judgment and boundaries in his attempts to assist staff." When testifying, he clarified that Mr. Weaver was "overly friendly" with staff members and, at times, "intrusive * * * with his peers." He offered as examples that Mr. Weaver would tell female staff members, "'You love me. You know you love me,'" and would intervene when the staff attempted to address issues with fellow patients. Though Dr. Seibel did not diagnose Mr. Weaver with a mental illness, he testified that he had no doubt Mr. Weaver "need[ed] significant supervision * * * based on * * * what [he] observed about him and what [he] [knew] about his charge and * * * the account that [Mr. Weaver] gave [him] related to that * * *." His initial recommendation was that his facility, Heartland Behavioral Healthcare, was the least restrictive alternative for Mr. Weaver's care, "taking into consideration community safety * * *." He later retracted that recommendation, however, and instead recommended that Mr. Weaver undergo an intellectual disability evaluation. Even so, he testified that the reason for his retraction was that, "taking a very close look at the statute," he did not believe he was qualified to offer an opinion as to whether Mr. Weaver was subject to institutionalization. It was his impression that, by statute, that determination had to be made by a psychologist designated by the director of developmental disabilities. *But see* R.C. 2945.371(G)(3)(b) and (G)(3)(d).

{¶35} Dr. Cowan, the designated psychologist from the Ohio Department of Developmental Disabilities, met with Mr. Weaver to conduct an intellectual disability evaluation. He reported that he met with Mr. Weaver for an hour and a half and reviewed his records to assess his intellectual and adaptive functioning. The doctor determined that Mr. Weaver suffered from a mild rather than moderate intellectual disability and that his adaptive skills "overall appear[ed] to be at least within the high Mild Range of Intellectual Disability * * *." Based on those determinations, he opined that Mr. Weaver was not subject to institutionalization and would benefit from the Board's support in a community-based setting.

{¶36} When testifying, Dr. Cowan stated that an intellectual disability concerns a deficit in one's cognitive and adaptive functions while a mental illness concerns a disturbance or difficulty with mood or perception. He testified that he did not believe Mr. Weaver had a mental illness, but he did not elaborate. Similarly, his written report only contained a brief paragraph regarding Mr. Weaver's mental status. In that paragraph, he noted that Mr. Weaver did not appear to have an abnormal affect or mood, he denied suffering from hallucinations or suicidal/homicidal ideations, and "there was no evidence of fixed delusional systems or responding to internal stimuli." The focus of Dr. Cowan's examination was to identify Mr. Weaver's cognitive deficits and the extent of his adaptive functioning (e.g., his self-care skills).

{¶37} Dr. Cowan made no note of Mr. Weaver's criminal history, but both Dr. Biscaro and Dr. Seibel included that information in their respective reports. Both reported that Mr. Weaver accrued: (1) a public indecency/exposure charge in 1995 that was dismissed; (2) a drug paraphernalia conviction in 2002; and (3) a disorderly conduct conviction in 2014. Dr. Seibel noted that the instant action, as well as the 2014 case, occurred while Mr. Weaver was living on his own.

{¶38} Apart from the three experts who gave evidence, the trial court also heard testimony from Ms. Justice and listened to a recording of Mr. Weaver's police interview. As previously noted, Ms. Justice interviewed S.W. in connection with a complaint regarding sexual abuse. She testified as to the statements S.W. made during their interview, including that Mr. Weaver had used his tongue to kiss her on multiple occasions. Meanwhile, during his police interview, Mr. Weaver admitted he had kissed S.W. several times. He even admitted that he used his tongue, but claimed that he did that on only one occasion. He indicated that he kissed S.W. because he liked her and hoped she could be his girlfriend someday. He also admitted that the kiss excited him.

{¶39} Mr. Weaver argues that the court erred by finding him mentally ill and subject to court order. With regard to the first finding, he asserts that there was no evidence he suffered from a mental illness. He argues that not one of the three experts who examined him drew that conclusion and two of those experts affirmatively testified that he did not have a mental illness. According to Mr. Weaver, "the fact that all [the] experts concluded that he is not mentally ill is dispositive * * *." (Emphasis omitted.) Because his cognitive deficits only affect his intellectual functioning and no one testified that he suffers from a substantial disorder that grossly impairs his judgment, he argues that there is insufficient evidence that he suffers from a mental illness.

{¶40} With regard to the court's finding that he is subject to court order, Mr. Weaver asserts that the State failed to set forth clear and convincing evidence that he satisfies the criteria set forth in R.C. 5122.01(B)(2) or (B)(4). Other than the incidents for which he was indicted, he argues that there was no evidence he is presently dangerous or represents a substantial risk to society. He asserts that his criminal record is negligible and does not contain any convictions for violent offenses or offenses related to sexual misconduct. He also asserts that there was a wealth

of evidence concerning his pleasant, cooperative demeanor and his ability to live independently. Finally, because he apologized for his behavior, he argues that there was evidence he understood the seriousness of his conduct.

{¶41} This Court rejects Mr. Weaver's contention that, before a court may declare a defendant mentally ill, it must have before it expert evidence that the defendant has been formally diagnosed as such. A "mental illness" is a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). Noticeably absent from that definition is any requirement that a person be diagnosed with a recognized, classifiable disorder (i.e., one recognized by the diagnostic and statistical manual of mental disorders). *See State v. Knoble*, 9th Dist. Lorain No. 08CA009359, 2008-Ohio-5004, ¶ 12, quoting *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, ¶ 14 (clear and unambiguous statutes must be enforced as written). While the legislature linked the statutory definition of a "moderate level of intellectual disability" to the diagnostic and statistical manual of mental disorders, it did not do so when defining the phrase "mental illness." *Compare* R.C. 5123.01(P) *with* R.C. 5122.01(A). To that end, the Tenth District has rejected the notion that a defendant must be professionally diagnosed as suffering from a classified mental disorder before a court may adjudge him mentally ill for purposes of R.C. 5122.01(A). *Decker*, 2017-Ohio-4266, at ¶ 26, citing *In re McKinney*, 8 Ohio App.3d 278, 280-281 (10th Dist.1983). Our sister district has held that, "when a court construes the statute for the hospitalization of a mentally ill person, it must abide by the plain meaning of the definition of mental illness as set forth in R.C. 5122.01(A)." *Decker* at ¶ 26. This Court agrees with that proposition. *See Knoble* at ¶ 12, quoting *Hubbard* at ¶ 14.

{¶42} The word "substantial" has several meanings, including "important, essential" and "considerable in quantity: significantly great." *Merriam-Webster's Collegiate Dictionary* 1245 (11th Ed.2004). Meanwhile, a "disorder" is defined as "an abnormal physical or mental condition." *Id.* at 360. *See also id.* at 259 (defining "condition" as "a state of being" and "a [usually] defective state of health"). "Grossly" is synonymous with "flagrant" and can be defined as "glaringly noticeable [usually] because of inexcusable badness or objectionableness." *Id.* at 551. Finally, "impaired" means "in a less than perfect or whole condition" as in "disabled or functionally defective * * *." *Id.* at 622.

{¶43} Upon review, the trial court had sufficient evidence before it from which it could conclude that Mr. Weaver suffers from a mental illness for purposes of R.C. 5122.01(A). *See Schiebel*, 55 Ohio St.3d at 74. Mr. Weaver was charged with two counts of kidnapping and attendant sexual motivation specifications because, on several occasions, he restrained a seven-year-old girl, kissed her, and forced his tongue into her mouth. *See* R.C. 2945.39(B) (instructing court to consider all relevant evidence, including the acts constituting the offense charged). To the extent he acknowledged his conduct, he said that he kissed the girl because he liked her, the kiss excited him, and, someday, he hoped she could be his girlfriend. There was expert testimony that, due to an intellectual disability, Mr. Weaver suffered deficits in judgment, was unable to understand the seriousness of his conduct, and had an "unrealistic" appraisal "of the entire situation/outcome * * *." Moreover, Dr. Seibel, the expert from the facility that housed Mr. Weaver for six months, specifically testified that Mr. Weaver "need[ed] significant supervision * * * based on * * * what [he] observed about him and what [he] [knew] about his charge and * * * the account that [Mr. Weaver] gave [him] related to that * * *." Under these particular facts and circumstances, the trial court could have concluded that Mr. Weaver's

intellectual disability manifested itself as a substantial disorder of thought or perception that grossly impaired his judgment, behavior, or capacity to recognize reality. *See* R.C. 5122.01(A). *See also Decker* at ¶ 26, citing *In re McKinney* at 280-281. As such, notwithstanding the lack of a professional psychiatric diagnosis, the court did not err when it found, by clear and convincing evidence, that Mr. Weaver had a mental illness for purposes of R.C. 5122.01(A).

{¶44} With regard to the trial court's determination that Mr. Weaver is subject to court order, this Court likewise must conclude that the record contains sufficient evidence in support of that determination. *See Schiebel*, 55 Ohio St.3d at 74. Mr. Weaver engaged in extremely serious, grossly inappropriate conduct that will undoubtedly have a lasting effect on the seven-year-old he assaulted. Again, while he completed a brief, written apology at the police station, there was evidence that he simply did not appreciate the seriousness of his conduct and that he had an "unrealistic" appraisal "of the entire situation/outcome * * *." The court received evidence that he lived with his father for the vast majority of his life, but, in the few years he had been on his own, had been convicted of disorderly conduct and charged with his current offenses. *See In re Burton*, 11 Ohio St.3d at 149 (court may consider "any past history which is relevant to establish [an] individual's degree of conformity to the laws" in its totality of the circumstances review). There was evidence that his intellectual disability results in serious deficits in his judgment and that, according to Dr. Seibel, he "need[s] significant supervision * * *." *See id.* (court may consider any psychiatric testimony as to individual's condition). In fact, it was Dr. Seibel's initial recommendation, "taking into consideration community safety * * *," that Mr. Weaver remain in the care of Heartland Behavioral Health. Given Mr. Weaver's deficits in judgment, his inability to appreciate his wrongdoing, and the specific nature of his wrongdoing, the trial court could have determined that he represented a substantial risk to others

and was in need of treatment. *See* R.C. 5122.01(B)(2), (4); *In re Burton* at 149-150. As such, this Court cannot conclude that the court erred when it found, by clear and convincing evidence, that Mr. Weaver was a mentally ill person subject to court order. Mr. Weaver's second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED BY FINDING BY CLEAR AND CONVINCING EVIDENCE THAT MR. WEAVER IS A PERSON WITH AN INTELLECTUAL DISABILITY SUBJECT TO INSTITUTIONALIZATION BY COURT ORDER, AS REQUIRED BY R.C. § 2945.39(A)(2)(b) AND AS DEFINED BY R.C. §§ 5123.01(O) AND (P).

{¶45} In his third assignment of error, Mr. Weaver challenges the trial court's determination that he suffers from a moderate intellectual disability and, due to that disability, is subject to institutionalization. Given our resolution of Mr. Weaver's second assignment of error, his third assignment of error is moot, and we decline to address it. *See* App.R. 12(A)(1)(c).

III.

{¶46} Mr. Weaver's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

MATTHEW B. AMEER and PATRICK L. BROWN, Attorneys at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.