[Cite as *State v. Blackman*, 2024-Ohio-5249.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

MARKIESHA M. BLACKMAN,

    DEFENDANT-APPELLANT.

CASE NO. 1-23-75

O P I N I O N

Appeal from Allen County Common Pleas Court
Trial Court No. CR2022 0372

**Judgment Affirmed**

Date of Decision:  November 4, 2024

APPEARANCES:

    *Chima R. Ekeh* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**EPLEY, J.**

{¶1} Defendant-appellant Markiesha M. Blackman appeals from a judgment of the Allen County Court of Common Pleas, which retained jurisdiction over her pursuant to R.C. 2945.39(A)(2) and ordered her to be committed to the Department of Mental Health and Addiction Services (MHAS) for inpatient treatment at Northwest Ohio Psychiatric Hospital. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶2} At approximately 7:30 a.m. on November 22, 2022, emergency services were alerted to a house fire at 12 West O'Connor Avenue in Lima. Officer Logan Patton, who was patrolling in the area, saw smoke coming from the house and responded to the scene. He learned that the house had four occupants, all of whom were able to exit the home; at least one had to jump from a second-story window. They told Patton that Blackman was in the house just prior to the fire and that she had started the fire intentionally on the enclosed back porch. A neighbor had spoken with Blackman as she fled from the house. The neighbor reported that Blackman was in a hurry to get away from the area.

{¶3} Blackman was soon apprehended. After her arrest, she told Detective Steven Stechschulte that she had gotten into a physical altercation with two of the

home's occupants. Stechshulte summarized: "Ms. Blackman said she was angry and hurt because of the altercation, so to get revenge, she stacked up some boxes that were on the back porch and lit them on fire, knowing the four people were still in the house. Ms. Blackman claimed she didn't think about the fact the fire could seriously hurt or kill anyone. She said she was just angry and didn't think about the potential consequences of the fire." Stechshulte Aff., ¶ 11 (Nov. 25, 2022).

{¶4} In January 2023, Blackman was indicted on four counts of aggravated arson in violation of R.C. 2909.02(A)(1), a first-degree felony, and one count of aggravated arson in violation of R.C. 2909.02(A)(2), a second-degree felony. She originally pled not guilty to the charges.

{¶5} In March 2023, Blackman was transported from the Allen County Jail to the hospital for treatment for an acute intracerebral hemorrhage. After an extended stay, she returned to the Allen County Jail. On May 16, 2023, Blackman was involved in a fight at the jail, causing her to be hospitalized for another brain injury. Blackman was 30 years old.

{¶6} On June 21, 2023, defense counsel moved for evaluations of Blackman's general mental health and her competency. He indicated that his concern was based on Blackman's statements and actions, as well as the allegations in the indictment. Blackman also requested leave to enter a not guilty by reason of insanity (NGRI) plea. The court granted the change in plea and ordered Blackman to be evaluated regarding her competency and NGRI plea. On July 27, 2023,

Blackman was examined by Dr. Carla Dreyer, a clinical psychologist, at Forensic Psychiatry Center for Western Ohio.

{¶7} After a hearing on August 31, 2023, the trial court found that Blackman was not competent to stand trial and that she was not restorable to competency within the one-year time limit. The court ordered Blackman to be committed to Northwest Ohio Psychiatric Hospital – Toledo Campus Facility "for security purposes and the administration of medication if warranted, which is the least restrictive means of treatment and to attempt restoration to competency."

{¶8} Approximately three weeks later, the State asked the trial court to set a hearing on the court's retaining jurisdiction over Blackman under R.C. 2945.39(A). On November 3, 2023, the trial court conducted a hearing during which Dr. Dreyer and Detective Stechschulte testified. The State also offered five exhibits: Dr. Dreyer's written reports dated August 9, 2023, a CD of the detective's interview with Blackman, a photograph of an apology letter written by Blackman, and two photographs of the house.

{¶9} On November 6, 2023, the trial court granted the State's motion to retain jurisdiction. It found that the State had presented clear and convincing evidence that Blackman had committed aggravated arson. It further found that Blackman was a mentally ill person subject to court order. After stating it had considered the least restrictive alternative available that was consistent with public safety and treatment goals, the court ordered Blackman to be committed to the care

of MHAS, specifically inpatient treatment at Northwest Ohio Psychiatric Hospital. It further ordered that, as soon as appropriate, if ever, she was to be considered for placement in a nursing home facility.

{¶10} Blackman appeals from the trial court's November 6, 2023 judgment, raising one assignment of error.

## II. Continued Jurisdiction under R.C. 2945.39(A)(2)

{¶11} In her sole assignment of error, Blackman claims that the trial court "erred by finding that the State presented clear and convincing evidence that Ms. Blackman is a mentally ill person subject to court order." On appeal, she does not contest that the State presented sufficient evidence to find that she committed aggravated arson, nor does she challenge the trial court's conclusion that she is a mentally ill person. Rather, Blackman contends that she should not be subject to court order. She further claims that placement in a nursing home, not at Northwest Ohio Psychiatric Hospital, was the least restrictive commitment alternative available for her consistent with public safety and her welfare.

### A. Relevant Law

{¶12} R.C. 2945.39, along with its related statutes, "authorizes a common pleas court to exercise continuing jurisdiction over a criminal defendant who has been charged with a violent first- or second-degree felony and who has been found incompetent to stand trial and remains so after the expiration of R.C. 2945.38's one-

year time frame for restoring competency." *State v. Williams*, 2010-Ohio-2453, ¶ 1. The court may retain jurisdiction over the defendant if, at a hearing, it finds by clear and convincing evidence that (1) "the defendant committed the offense with which the defendant is charged," and (2) "the defendant is a person with a mental illness subject to court order or a person with an intellectual disability subject to institutionalization by court order." R.C. 2945.39(A)(2)(a) and (b); s*ee State v. Sims*, 2022-Ohio-3365, ¶ 40 (3d Dist.).

{¶13} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954); *Sims* at ¶ 41.

{¶14} If the trial court makes the findings under R.C. 2945.39(A)(2), it must commit the defendant (if determined to require mental health treatment) either to MHAS for treatment at a hospital, facility, or agency, or to another medical or psychiatric facility, as appropriate. R.C. 2945.39(D)(1). "In determining the place of commitment, the court shall consider the extent to which the person is a danger to the person and to others, the need for security, and the type of crime involved." *Id*. It must "order the least restrictive alternative available that is consistent with public safety and the welfare of the defendant," giving preference to protecting

public safety. *Id.*; *Williams* at ¶ 15. If the trial court orders a defendant committed under R.C. 2945.39(D)(1), all further proceedings are governed by R.C. 2945.401 and R.C. 2945.402. R.C. 2945.39(D)(3).

{¶15} Blackman agrees that she is a person with a mental illness. "Mental illness" means "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A).

{¶16} Blackman contends, however, that she is not a "person with a mental illness subject to court order." That term has the same meaning as in R.C. 5122.01(B). *See* R.C. 2945.37(A)(7). It includes a person with a mental illness who, because of the person's illness, either:

> (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;
>
> (2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;
>
> (3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community;
>
> (4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior

that creates a grave and imminent risk to substantial rights of others or the person;

(5)(a) Would benefit from treatment as manifested by evidence of behavior that indicates all of the following:

(i) The person is unlikely to survive safely in the community without supervision, based on a clinical determination.

(ii) The person has a history of lack of compliance with treatment for mental illness . . .

(iii) The person, as a result of the person's mental illness, is unlikely to voluntarily participate in necessary treatment.

(iv) In view of the person's treatment history and current behavior, the person is in need of treatment in order to prevent a relapse or deterioration that would be likely to result in substantial risk of serious harm to the person or others.

R.C. 5122.01(B). If the defendant only satisfies R.C. 5122.01(B)(5)(a), he or she is not subject to hospitalization. R.C. 5122.01(B)(5)(b).

{¶17} It is within the court's discretion as to what evidence to review when determining whether a defendant is a "person with a mental illness subject to court order." *Sims*, 2022-Ohio-3365, at ¶ 47, citing *State v. Weaver*, 2018-Ohio-2998, ¶ 28 (9th Dist.). The court may consider "all relevant evidence, including, but not limited to, any relevant psychiatric, psychological, or medical testimony or reports, the acts constituting the offense charged, and any history of the defendant that is relevant to the defendant's ability to conform to the law." R.C. 2945.39(B). In reaching its determination, the trial court must consider the totality of the circumstances. *Sims* at ¶ 47.

**B. Evidence Presented at the November 3, 2023 Hearing**

**{¶18}** Dr. Dreyer testified that she completed two forensic evaluations of Blackman on July 27, 2023: the first assessed her for competency to stand trial, and the second focused on the least restrictive setting in terms of maintaining jurisdiction. She found that Blackman was incompetent to stand trial and was unable to be restored to competency within the time allowed by law. For the second evaluation, Dr. Dreyer used the same procedure as for individuals who are found not guilty by reason of insanity. Dr. Dreyer prepared two reports dated August 9, 2023, submitted collectively as State's Ex. 1.

**{¶19}** Dr. Dreyer opined that Blackman was a mentally ill person subject to court order. She explained that Blackman had a history of mental illness prior to her offenses but then had two separate brain injuries during her incarceration that left her with a major neurocognitive disorder (the term now used for dementia). Blackman had suffered a series of cerebral vascular incidents similar to strokes. The second brain injury caused the most damage. As a result, Blackman has "substantial disorder of thought, of orientation, of memory, and she essentially has aphasia [a disorder affecting communication] as well." Tr. 15. Her condition includes impulsivity and poor decision-making. Blackman had no current suicidal or homicidal ideations, although she reported being suicidal when she was younger.

**{¶20}** During her evaluation, Blackman was "difficult to engage;" she struggled to communicate and had "markedly poor memory and attention abilities,"

although Dr. Dreyer also found her cooperative and pleasant. Tr. 15-16. Blackman's appearance was remarkable in that part of her head appeared to be shaven; Blackman could not explain this, although the transporting officer noted that it was related to her surgery. Blackman also had poor hygiene and grooming. Dr. Dreyer's written report indicated that the evaluation (which lasted 30 minutes) was abbreviated due to Blackman's "confusion and mental instability." Ex. 1 at 2. In making her assessment, Dr. Dreyer had also considered numerous sources, including Blackman's criminal history, court records, police reports, video recordings of Blackman's police interviews, hospital records, jail records, and statements from Blackman's mother and attorney.

{¶21} Dr. Dreyer explained during her cross-examination that, as part of her second evaluation, she used a risk assessment checklist (HCR-20v3) based on the information she had available regarding Blackman's history and her presentation during the assessment. The assessment has ten historical risk factors, five clinical factors, and five risk management scale items. Blackman had nine of the historical risk factors, including "a history of problems with violence, other antisocial behavior, relationships, employment, substance use, major mental disorder, traumatic experiences, violent attitudes, and treatment or supervision response." Ex. 1 at 12. Four of the clinical items were present: recent problems with insight, violent ideation or intent, symptoms of major mental disorder, instability, and treatment or supervision response. In addition, all the risk management scale items

were present: future problems with professional services and plan, living situation, personal support, treatment or supervision response, and stress or coping.

{¶22} Defense counsel asked Dr. Dreyer what she knew about Blackman's altercation at the jail in May 2023. Dr. Dreyer testified that she had received the incident report, which indicated that an inmate had thrown a cup toward Blackman, who then "got up in" the inmate's face. Blackman threw a punch at the inmate, resulting in the inmate punching back. Jail staff separated the women; both were bleeding from their faces. Staff later found Blackman in a condition that prompted them to return her to the hospital.

{¶23} When asked which subparts of R.C. 5122.01(B) Blackman satisfied, Dr. Dreyer responded R.C. 5122.01(B)(3), (4) and (5). With respect to (B)(3), Dr. Dreyer stated that Blackman was "at risk for getting herself into risky situations where she could get hurt. . . [S]he has a significant brain injury, she's not going to be able to care for herself in the same way, at least when I saw her, and that's what that is referencing here." Tr. 35. Dreyer also stated that she could not provide for her basic needs and those could not be accommodated immediately in the community. With (B)(4), Dr. Dreyer noted that Blackman had allegedly set the fire in the past (referring to the charged offenses), and "there is information to suggest that it occurred and that she needs treatment because she is at risk for continued risks of – or acts of violence." Tr. 34-35. Dr. Dreyer testified that she also met (B)(5) – "she would benefit from treatment due to she is unlikely to survive safely

in the community without supervision. Um, history of lack of compliance with treatment for mental illness." *Id*.

{¶24} In terms of the least restrictive care available, Dr. Dreyer testified that, when she saw Blackman, the options were conditional release in the community or placement in a hospital. Dreyer stated that "it was clear she probably needs nursing home care at some point in time. However that had not been arranged; there was no plan for that. So, the least restrictive setting would be the state psychiatric hospital. Which for your county is NOPH up in Toledo and so I did recommend that with the understanding that eventually that hospital would most likely petition the Court for conditional release to a nursing home once they have those arrangements in place." Tr. 10.

{¶25} When asked about available community resources for Blackman during cross-examination, Dr. Dreyer emphasized that it would take time to find a placement to meet Blackman's needs. She stated, in part:

> It is difficult to place someone with an aggravated arson history, particularly in her condition. So somebody needs to set that up. I do the assessment and I can say what she needs[;] I am not there to set up those services. So if there is not something that is already set up, there's no provision for it. It's going to take a while, even for the hospital, to get her into a nursing home placement where she is going to be able to receive that, get the necessary treatment that she would need beyond the hospital setting. And even the jail has indicated in their records that they thought she needed additional therapies, physical therapy and so forth, but they're not able to do that while she's within the jail. And I don't have any other – nobody has given me a plan that says we've found a particular nursing home that she could immediately go to, that has accepted her. There's a whole

process for going through that and none of that had been done or accomplished and that's not my job to set that up.

Tr. 36-37.

{¶26} Detective Stechschulte's testimony mostly concerned whether Blackman had committed the charged offenses. During his testimony, the State played a recording of his interview with her at approximately 10:14 a.m. on November 22, 2022, the same day as the house fire. The exhibit was redacted to remove questioning about other incidents, but Det. Stechschulte referenced during his questioning that Blackman may have started other fires.

{¶27} The State also submitted a copy of an "apology letter" that Blackman had written. She expressed that she did not intend for the fire to get big and thought the victims could see it. Blackman apologized for putting the victims' lives in jeopardy, but she also stated that she forgave them for their "past attacks" and hurting her. She acknowledged that she had acted impulsively, said she was sorry, and asked them not to press charges.

### C. Trial Court's Ruling and Appellate Review

{¶28} In concluding that Blackman was a mentally ill person subject to court order, the court noted that, less than a year before, Blackman had set fire to a home knowing that four individuals were present; she did so because she was angry at them. The court pointed to Blackman's comments in her "apology" letter, written before her two traumatic brain injuries (TBIs), blaming the victims and asking them

not to press charges. The court further noted that after Blackman's first brain injury, which resulted in surgery and prolonged hospitalization, she engaged in risky and violent behavior at the jail, resulting in her assaulting another inmate and being assaulted in return. The court continued:

> "What is clearly and convincingly evident in the defendant's history is that she engages in risky, impulsive, and, at times, violent behavior. This was true even before the defendant's cognitive state deteriorated so badly in May of 2023. Now, her already poor judgment is "grossly impaired" and she lacks the capacity to recognize reality or to meet even her most basic needs for everyday life."

{¶29} In a footnote, the trial court noted Dr. Dreyer's opinion that Blackman did not currently present a substantial risk of physical harm to herself or others. The court considered, however, that Blackman was in custody and thus under the supervision of corrections officers. The court found that Blackman's history (violence and substance abuse) coupled with her substantially impaired judgment resulted in her being a grave and imminent risk to others and herself if released into the community without proper safeguards.

{¶30} Finally, the court found that there was no evidence that Blackman would be appropriately monitored and cared for if released without any court intervention. Moreover, it credited Dr. Dreyer's testimony that placement in a nursing home, even if appropriate, would be difficult to find and would take a significant amount of time to arrange due to Blackman's mental and physical needs as well as her violent behavior.

{¶31} The trial court therefore found that Blackman met the criteria for R.C. 5122.01(B)(3) and (4). It further found that commitment to MHAS for treatment was the least restrictive alternative available that was consistent with public safety and Blackman's needs. It further ordered, however, that MHAS be considered for placement in an appropriate nursing home facility as soon as appropriate, if ever.

{¶32} With the record before us, the trial court did not err in finding that Blackman is a mentally ill person subject to court order or in placing her with MHAS for treatment. To satisfy R.C. 5122.01(B)(3), the State was required to show that Blackman represented "a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community[.]"

{¶33} Here, there was significant evidence that Blackman's ability to care for herself was significantly impaired. Prior to her brain injuries, Blackman engaged in violent and impulsive behavior, and she had a history of mental illness and substance abuse. During the pendency of her aggravated arson case, she suffered two brain injuries that left her with a major neurocognitive disorder. Dr. Dreyer noted that Blackman's memory of both recent and remote events was poor; Blackman was unable to explain why her head was partially shaved, although she had surgery. Dr. Dreyer described Blackman as confused and with poor attention

abilities. Blackman had substantial disorder of thought, orientation, and memory, along with aphasia, impulsivity, and poor decision-making. Dr. Dreyer indicated that Blackman had been noted to "struggle to care for her basic needs." At her evaluation, Blackman had poor hygiene and grooming, and Dr. Dreyer noted significant body odor. In short, the trial court did not err in concluding that Blackman's condition and history created a substantial and immediate risk of physical impairment or injury to herself. In addition, the record amply supported that appropriate provisions for her needs were not immediately available in the community.

{¶34} We also find no error in the trial court's conclusion that Blackman met the criteria for R.C. 5122.01(B)(4), which requires a showing that Blackman would benefit from treatment for her mental illness and was in need of such treatment "as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person[.]" Before her brain injuries, Blackman had engaged in violent and impulsive behavior, including the aggravated arson offenses. After her first brain injury, she was involved in an altercation in the jail, which she escalated even if she did not start it. Blackman's current condition includes confusion, impulsivity, and poor memory, attention abilities, and decision-making. The record thus demonstrated that Blackman would benefit from treatment for her mental illness and that her behavior creates a grave and imminent risk to others.

{¶35} Finally, we find no error in the trial court's placement of Blackman at Northwest Ohio Psychiatric Hospital, with the proviso that she be considered for placement in an appropriate nursing home facility as soon as appropriate. Dr. Dreyer explained in detail that placement in a nursing home would be difficult and time-consuming to arrange and, consequently, placement at the hospital was the least restrictive alternative available consistent with public safety until an appropriate nursing home facility was found. The trial court did not err in following that recommendation.

{¶36} Blackman's assignment of error is overruled.

## III. Conclusion

{¶37} The trial court's judgment is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**

**/hls**

**\*\* Judge Christopher B. Epley of the Second District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**